# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| Nasser Yassine<br>1907 Merl Avenue<br>Cleveland, Ohio 44109 | )<br>)<br>)<br>) | **1:02CV2449**<br>Case No. _____<br>**JUDGE MANOS** |
| Plaintiff, | )<br>) | |
| v. | )<br>) | **MAG. JUDGE STREEPY** |
| University Hospitals Health Systems<br>11100 Euclid Avenue<br>Cleveland, Ohio 44106 | )<br>)<br>)<br>) | **Complaint** |
| Southwest General Health Center<br>18697 Bagley Road<br>Middleburg Heights, Ohio 44130 | )<br>)<br>)<br>) | (Jury Demand Endorsed Hereon) |
| John L. Schurmeier<br>President/Ex-Officio Trustee<br>Southwest General Health Center<br>18697 Bagley Road<br>Middleburg Heights, Ohio 44130 | )<br>)<br>)<br>)<br>)<br>) | |
| Dan O'Beirn<br>Southwest General Health Center<br>18697 Bagley Road<br>Middleburg Heights, Ohio 44130 | )<br>)<br>)<br>)<br>) | |
| Robert Willson<br>Southwest General Health Center<br>18697 Bagley Road<br>Middleburg Heights, Ohio 44130 | )<br>)<br>)<br>)<br>) | |
| Jerry Schmotzer<br>Southwest General Health Center<br>18697 Bagley Road<br>Middleburg Heights, Ohio 44130 | )<br>)<br>)<br>)<br>) | |
| Steve Marshall<br>Southwest General Health Center<br>18697 Bagley Road<br>Middleburg Heights, Ohio 44130 | )<br>)<br>)<br>)<br>) | |

| | |
|---|---|
| Jack Watson | ) |
| Southwest General Health Center | ) |
| 18697 Bagley Road | ) |
| Middleburg Heights, Ohio 44130 | ) |
| | ) |
| Dave Matchett | ) |
| Southwest General Health Center | ) |
| 18697 Bagley Road | ) |
| Middleburg Heights, Ohio 44130 | ) |
| | ) |
| Tom Green | ) |
| Southwest General Health Center | ) |
| 18697 Bagley Road | ) |
| Middleburg Heights, Ohio 44130 | ) |

Now comes the above Plaintiff, Mr. Nasser Yassine (hereinafter "Plaintiff Yassine"), by and through undersigned counsel, J. M. Smaili, Esq., and hereby alleges the following for his Complaint:

## Nature of the Action

This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e, et seq., and Title I of the Civil Rights Act of 1991, 42 U.S.C. Section 1981a, as well as under Ohio State laws and policies, to correct unlawful discrimination on the basis of retaliation, race, religion and national origin, and to make whole Plaintiff Yassine.

## Jurisdiction

This Court has jurisdiction over Plaintiff Yassine's claims based upon 28 U.S.C. Sections 1331 and 1343 since they arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq., and Title I of the Civil Rights Act of 1991, 42 U.S.C. Section 1981a. Plaintiff Yassine further invokes the pendent jurisdiction of this Court to consider additional claims arising under state law. The amount in controversy exceeds $75,000 excluding costs and attorneys' fees.

2

Furthermore, personal jurisdiction exists since all of the defendants listed herein are domiciled in the State of Ohio and can be found in this District and would be served within same.

## Venue

Venue is proper in this District pursuant to 28 U.S.C. Section 1391, 42 U.S.C. Section 12117(a) because the unlawful employment practices are alleged to have been committed in this District, and, upon information and belief, the employment records relevant to such practices are maintained and administered in this District, and Plaintiff Yassine worked in this District but for the alleged unlawful employment practices.

## Parties

1. Plaintiff Yassine is an Arab-American and is a practicing member of the Islamic faith;

2. Defendant University Hospitals Health System (hereinafter "Defendant University Hospitals"), according to information from its Web site, "is the region's premier healthcare delivery system, serving patients at more than 150 locations throughout northern Ohio."[1] "University Hospitals Health System offers the region's largest network of primary care physicians, outpatient centers and hospitals. The System also includes a network of specialty care physicians, skilled nursing, elder health, rehabilitation and home care services, managed care and insurance programs, occupational health & wellness, and the most comprehensive behavioral health services in the region. * * * Nearly 25,000 physicians and employees comprise University Hospitals Health System and its partner hospitals, ranking it northern Ohio's largest employer. The System provides more than 3 million outpatient visits and 110,000 inpatient discharges annually." Id.

---

[1] See *http://www.uhhs.com/DisplayContent.asp?GNAV=&MID=0&PageID=101*

3

3.     Defendant Southwest General health Center (hereinafter "Defendant Southwest") Southwest General entered a unique partnering agreement with Defendant University Hospitals in 1997 making it the flagship hospital for Defendant University Hospitals on Cleveland's West Side.[2] Currently, Defendant Southwest is Defendant University Hospitals' partner, and is "a private, not-for-profit, 340-bed facility serving southwestern Cuyahoga, eastern Lorain and northern Medina counties."[3] Defendant Southwest is a "community health center providing adult/pediatric medical & surgical specialties; comprehensive ancillary & support services, including home health, hospice, transitional care, & LifeWorks Health & Wellness Center."[4]

4.     Defendants University Hospitals and Southwest are duly organized and existing under the laws of the State of Ohio with their principal places of business located in Cuyahoga County, Ohio. At all relevant times herein, Defendants University Hospitals and Southwest have continuously been an employer within the meaning of Section 701(b), (g) and (h) of Title VII, 42 U.S.C. Section 2000e (b), (g) and (h) and have continuously had at least 15 employees;

5.     The remaining Defendants held management, semi-management and/or employment positions as employees for Defendants University Hospitals and/or Southwest. Defendants University Hospitals and Southwest, at all times relevant herein, aided and abetted Defendants John L Schurmeier, Dan O'Beirn, Robert Willson, Jerry Schmotzer, Steve Marshall, Jack Watson and Dave Matchett, and such Defendants aided and abetted each other, in subjecting Plaintiff Yassine to unlawful employment practices and to employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq., and Title I of the Civil Rights Act of 1991, 42 U.S.C. Section 1981a. All Defendants are being sued in their

---

[2] See *http://www.swgeneral.com/index1.asp?link=1*

[3] See *http://www.swgeneral.com/index1.asp?link=1*

[4] See *http://www.uhhs.com/Facility_Detail.asp?GNAV=&MID=10&facility_id=326*

4

individual and employment/supervisory/official capacities;

## Introduction

6. Plaintiff Yassine, at all times relevant to this cause of action, was married to Elissa Yassine, and moved to Cleveland, Ohio from Dearborn, Michigan in order to commence employment with Defendants University Hospitals and Southwest in September, 2000;

7. Plaintiff Yassine holds a master's degree in biomedical engineering. That he was hired by Defendants University Hospitals and Southwest as a biomedical technician in Southwest General Hospital's BIOMED Department, given a job title of BMET, and he commenced employment on September 25, 2000;

8. On January 3, 2001, Plaintiff Yassine satisfactorily completed his Introductory Period at Southwest General Hospital, and received "excellent" reviews and evaluations;

9. Throughout his employment with Defendants University Hospitals and Southwest, Plaintiff Yassine encountered severe harassment, discrimination and mistreatment by named Defendants. Plaintiff Yassine complained about such action and/or inaction by Defendants, and grieved same, but nothing was done in response and the employment conditions increased substantially until he was terminated on October 25, 2001;

10. Plaintiff Yassine filed a complaint/charge of discrimination with the Ohio Civil Rights Commission and the United States Equal Employment Opportunity Commission on February 27, 2002. On September 30, 2002, Plaintiff Yassine received his right to sue letter, attached hereto as Plaintiff's Exhibit "A";

## Causes of Action

11. Throughout his career with Defendants University Hospitals and Southwest, Plaintiff Yassine issued written and oral statements, and/or grievances, to Defendants University

5

Hospitals and Southwest, his managers, and others, regarding the harassment and the difficulties he was encountering at his workplace. Defendants University Hospitals and Southwest took no action to remedy same;

12. During all relevant times herein, Defendant Southwest maintained a television, with access to the Cable News Network (hereinafter "CNN") in the work area of Plaintiff Yassine and his co-employees;

13. On December 14, 2000, Defendant Steve Marshall, an employee of Defendants University Hospitals and Southwest, made the following statement to Plaintiff Yassine on the premises of Defendant Southwest and during work hours, "I have no problem getting in a helicopter and shoot Arabs." Prior to making such statements to Plaintiff Yassine, Defendant Steve Marshall was watching events unfold on CNN after the U.S.S. Cole was the target of an attack off of the coast of the Country of Yemen;

14. Subsequently, Plaintiff Yassine informed the acting manager, Defendant Tom Green, regarding the treatment that he was receiving from Steve Marshall, but nothing was done by Defendant Tom Green to remedy the situation. Defendants Jack Watson, another employee of Defendant University Hospitals and Southwest, and Dave Matchett, continued to treat Plaintiff Yassine in a derogatory and discriminatory manner after Plaintiff Yassine's communication to Tom Green;

15. On or about January 19, 2001, Defendant Jack Watson verbally referred to Plaintiff Yassine as a "dumb shit." Plaintiff Yassine again complained to Defendant Tom Green but again nothing was done to remedy the situation;

16. On January 22, 2001, Defendants Jack Watson and Dave Matchett verbally harassed, threatened and yelled at Plaintiff Yassine for being chosen by his then Manager, Marcia Ernie, to

6

attend a training school. Plaintiff Yassine again complained to Defendant Tom Green and to Director Jerry Schmotzer regarding same. Defendant Tom Green again failed to do anything. Defendant Jerry Schmotzer told Plaintiff Yassine to go directly to Defendants Watson and Matchett and "iron out" their differences;

17. On February 12, 2001, Plaintiff Yassine responded to the EKG Department of Defendant Southwest to a muse problem since Defendant Dave Matchett was late arriving to work. After fixing the problem, Defendant Dave Matchett began to yell at Plaintiff Yassine in front of numerous other employees/colleagues and screamed "you are messing up my department, and you don't know what you are doing." Plaintiff Yassine complained to Defendant Tom Green and yet again nothing was done by Defendant Green or Defendants University Hospitals and/or Southwest to remedy the situation;

18. On February 20, 2001, Defendant Robert Willson came a few inches from Plaintiff Yassine's face, pointed his finger in Plaintiff Yassine's face, and yelled at Plaintiff Yassine. Plaintiff Yassine informed Defendant Tom Green of same and nothing was done to remedy the situation;

19. On February 21, 2001, Defendant Robert Willson again came a few inches from Plaintiff Yassine's face and yelled at Plaintiff Yassine after Plaintiff Yassine had communicated a message from his department to Defendant Robert Willson. Plaintiff Yassine informed Defendant Tom Green of same and nothing was done to remedy the situation;

20. On March 8, 2001, Defendant Jack Watson assigned his preventative maintenance work order to Plaintiff Yassine. This was not allowed under Defendant University Hospitals and Southwest policy. Plaintiff Yassine gave back the order to Defendant Jack Watson. Defendant Jack Watson then yelled at Plaintiff Yassine and threw a metal object at Plaintiff Yassine, which

7

hit Plaintiff Yassine in his stomach area. Plaintiff Yassine complained to Defendants Tom Green, Jerry Schmotzer, and Defendant Southwest's HR department. Plaintiff Yassine also wrote a grievance regarding same. However, again, nothing was done.

21. On April 5, 2001, Defendant Dan O'Beirn, Plaintiff's new Manager, advised Plaintiff Yassine regarding two external job openings;

22. On April 24, 2001, was placed on a one day suspension by Defendant Dan O'Beirn after an innocent misunderstanding took place between Plaintiff Yassine and coworker Jennifer regarding the repair of a defective pump;

23. On July 3, 2001, Plaintiff Yassine was again the victim of Defendant Robert Willson's aggressive behavior. Plaintiff Yassine informed Defendant Dan O'Beirn regarding same; nothing was done;

24. Knowing all of the instances and history between Plaintiff Yassine and Defendant Willson, Defendant Dan O'Beirn told Plaintiff Yassine to work on a project with Defendant Willson on July 6, 2001. Defendant Willson became very belligerent towards Plaintiff Yassine and refused to work with Plaintiff Yassine. Plaintiff Yassine informed Defendant Dan O'Beirn regarding Defendant Willson's behavior but nothing was done to remedy same, nor was Defendant Willson disciplined for his behavior towards Plaintiff Yassine;

25. On July 10, 2001, Plaintiff Yassine was again the victim of Defendant Willson's belligerent behavior. Defendant Dan O'Beirn was informed regarding the recurring problem Plaintiff Yassine was experiencing, and Defendant Dan O'Beirn failed to act to remedy same;

26. On July 11, 2001, Plaintiff Yassine was told by Defendant Dan O'Beirn that Plaintiff Yassine was "incompetent." Plaintiff Yassine informed Defendant Jerry Schmotzer regarding same, and Defendant Jerry Schmotzer refused to intervene;

8

27. On July 13, 2001, Plaintiff Yassine was shouted at by Defendant Dan O'Beirn to go to Defendant Dan O'Beirn's office while Plaintiff Yassine was engaged in conversation with vendor Maureen Leach of Spacelabs. Defendant Dan O'Beirn does not shout at any other employees;

28. Plaintiff Yassine arrived back at his work station on August 20, 2001 and found an offensive picture of a homosexual nature in the top left drawer of his tool cart. The picture depicted a naked male. The picture had hand writing on it stating: "Who luvs ya baby?" Plaintiff Yassine informed Defendant Dan O'Beirn and HR regarding same and Defendant Dan O'Beirn told Plaintiff Yassine that he deserved same since Plaintiff Yassine's coworkers learned that Plaintiff Yassine had filed a grievance with HR;

29. During a departmental meeting, attended by Defendant Dan O'Beirn and Terry Drake, employee relations, Defendants Jack Watson, Secretary Ethel Pedro, Robert Willson and another individual from the Imaging Department whose name is unknown at this time, Defendant Jack Watson stated the following reasons in justification of his mistreatment of Plaintiff Yassine: "[Plaintiff Yassine] is an Arab, a Muslim and speaks Arabic * * * I am afraid that he will bring a gun to the shop and shoot us all." Defendant Watson also added that he has problems with "people" speaking foreign languages at airports, and that "this is the US, speak English damn it." These statements were made at the meeting and were heard by all those present. Defendant Watson was not disciplined regarding his offensive remarks. Plaintiff Yassine, after the meeting, attempted to file a continuation of his pending grievance but was informed by Sue Schloss, HR assistant director, that the grievance had been thrown away;

30. On August 22, 2001, Plaintiff Yassine was yelled at in a very loud manner regarding an alleged facsimile machine that was out of order, something that was not his responsibility, in

front of Defendants Robert Willson and Dave Matchett. Plaintiff Yassine attempted to explain the reasons for not attending to the facsimile machine, but Defendant Dan O'Beirn continued to shout at Plaintiff Yassine in front of his coworkers. Later, Plaintiff Yassine informed Defendant O'Beirn that he would appreciate it if he was not subjected to humiliation and ridicule in front of his coworkers but Defendant Dan O'Beirn told Plaintiff Yassine that "nobody is going to tell me how to run my department." Defendant Dan O'Beirn usually discusses any problems he may have with his other employees in the privacy of his office and does not shout at them in front of other workers;

31.     On September 5, 2001, Defendant Dan O'Beirn again yelled at Plaintiff Yassine hysterically without giving Plaintiff Yassine an opportunity to explain a situation;

32.     On the tragic morning of September 11, 2001, Plaintiff Yassine was subjected to continued harassment and violent remarks by Defendants Steve Marshall, Robert Willson, Jack Watson, and Dave Matchett regarding the attacks on the City of New York and Washington D.C. As a result, Plaintiff Yassine feared for his well-being;

33.     On September 12, 2001, Plaintiff Yassine noticed a worsened atmosphere at his workstation. Defendant Robert Willson made derogatory statements to Plaintiff Yassine. On September 13, 2001, Plaintiff Yassine complained to Defendant Dan O'Beirn regarding the treatment he was receiving from Defendant Robert Willson but Defendant Dan O'Beirn informed Plaintiff Yassine that he did not know whether he could do anything about it and did not know how to discipline Defendant Robert Willson. Plaintiff Yassine informed Defendant Dan O'Beirn that he could no longer tolerate the harassment that he was receiving by the herein Defendants. Finally, Defendant Dan O'Beirn called Defendant Robert Willson into his office for a discussion regarding Plaintiff Yassine's concerns. During the meeting, Defendant Robert Willson continued

to be offensive and belligerent towards Plaintiff Yassine, and Defendant Dan O'Beirn threatened Plaintiff Yassine that if Plaintiff Yassine told anyone outside of the department about the

to be offensive and belligerent towards Plaintiff Yassine, and Defendant Dan O'Beirn threatened Plaintiff Yassine that if Plaintiff Yassine told anyone outside of the department about the harassment that he was encountering within the department, he would be written up by Defendant Dan O'Beirn for a claim that would be brought by Defendant Robert Willson. Defendants Dan O'Beirn and Robert Willson both challenged Plaintiff Yassine to go ahead and write a grievance, and that if Plaintiff Yassine did file a grievance, Defendants Willson and O'Beirn would both bring forth two witnesses who would be willing to write fictitious grievances against Plaintiff Yassine stating that Plaintiff Yassine had threatened to "fuck biomed up" and that "he had a box-cutter."[5] Defendant Dan O'Beirn failed to take any action against Defendant Willson and actually assisted Defendant Willson in harassing and threatening Plaintiff Yassine;

34. Throughout the days subsequent to September 11, 2001, Defendants Robert Willson, Steve Marshall, Dave Matchett and Jack Watson would gather in the workshop near Plaintiff Yassine's workstation and watch CNN's coverage of the terrorist attacks. During this time, the above Defendants all made threatening remarks towards Plaintiff Yassine regarding Plaintiff Yassine's religion, ethnicity, national origin and race. Plaintiff Yassine was again feeling that his safety was being threatened by the above Defendants. Defendants would also make "sucking" noises behind Plaintiff Yassine's back and then simultaneously laugh at Plaintiff Yassine. Plaintiff Yassine reported all of these actions to Defendant Dan O'Beirn and Terry Drake but nothing was done to remedy same;

35. On October 2, 2001, while crossing the parking lot of the hospital, Defendant Steve Marshall, while driving toward Plaintiff Yassine, loudly revved the engine of his car while he

---

[5] This remark was of extreme significance to Plaintiff Yassine since the tragedy against our Country was perpetrated with individuals using box cutters.

11

starred at Plaintiff Yassine and sped up towards Plaintiff Yassine. Plaintiff Yassine believed that Defendant Marshall was attempting to run him over with his car. Plaintiff Yassine reported this incident to his manager/supervisors and HR but nothing was done to investigate same and no action was taken against Defendant Marshall;

36. On October 9, 2001, Defendant Robert Willson and Steve Marshall continued to make the "sucking" noise behind Plaintiff Yassine and began to laugh at Plaintiff Yassine. On that same date, Defendant Steve Marshall, while coming out of a parking spot in his car, started to rev the engine of his car at Plaintiff Yassine. This again made Plaintiff Yassine to fear for his safety;

37. On October 12, "Joe," Director of HR, Terry Drake, Defendant Dan O'Beirn and Defendant Schmotzer met to discuss the harassment and threats that Plaintiff Yassine was encountering. On October 15, 2001, Defendant Schmotzer informed Plaintiff Yassine that there was "no basis" for his allegations of harassment, yet indicated that he would speak to the corporate offices and discuss the situation with Defendant Southwest's attorney;

38. On October 16, 2001, Defendant Steve Marshall and Robert Willson made statements directed at Plaintiff Yassine regarding Plaintiff Yassine having a "phony Master's degree," and that Plaintiff Yassine "knows nothing," that he is "stupid," and a "dumb shit." On a different date, Defendant Dave Matchett told Plaintiff Yassine that Plaintiff Yassine had "taken a white man's job." Moreover, Defendant Willson stated "fuck the whole Middle East * * * we should drop a bomb on all of them faggots." At another time, while CNN was broadcasting images of dead Palestinian/Arab children, Defendant Willson made fun of what he called "dead Arabs." Plaintiff Yassine complained to Defendant Dan O'Beirn regarding same and nothing was done to remedy the situation;

39. On October 25, 2001, Plaintiff Yassine was informed by Defendant Dan O'Beirn that

12

Plaintiff Yassine was being terminated from employment with Defendants University Hospitals and Southwest effective immediately. Plaintiff Yassine was escorted out of the building by security officers;

40. On November 14, 2001, FBI Special Agent Richard Wrenn came to Plaintiff Yassine's residence and informed him that individuals at Defendant Southwest had telephoned him and informed him that Plaintiff Yassine was sympathetic to Ousama bin Laden and had a "box cutter." Special Agent Wrenn also informed Plaintiff Yassine that his coworkers had stated that Plaintiff Yassine was planning to flee to Syria and Lebanon in September, 2001, but could not since the airports were closed. Plaintiff Yassine's resume and diary were confiscated by the FBI. Thereafter, the FBI contacted Plaintiff Yassine regarding "gaps" on his resume;

41. On January 11, 2002, Defendant John Schurmeier informed Plaintiff Yassine that he received a totally different explanation regarding Plaintiff Yassine from Defendant Jerry Schmotzer. Defendant Schurmeier informed Plaintiff Yassine that he felt bad regarding the events that took place and the ongoing harassment of Plaintiff Yassine by managers, directors and coworkers, but he stated that he was unable to reinstate his employment. Defendant Schurmeier advised Plaintiff Yassine to "move on," and that Plaintiff Yassine should not have trouble finding another job. ;

42. Marsha Ernie, an African-American woman, the individual that hired Plaintiff Yassine initially, was also subjected to abuse and racial harassment and left employment with Defendant University Hospitals and Southwest prior to the termination of Plaintiff Yassine. Ms. Ernie had informed Plaintiff Yassine that Defendant Jerry Schmotzer had failed to investigate her complaints;

43. Plaintiff Yassine was hired to replace Marty Bradish, an individual of Indian descent

13

whom, according to Defendant Southwest's HR, was also subjected to much racial harassment and abuse by the same Defendants discussed above;

44. Throughout Plaintiff Yassine's employment with Defendant University Hospitals and Southwest, Defendants continuously harassed Plaintiff Yassine regarding his ethnicity and national origin. Plaintiff Yassine reported all of these episodes to his managers/supervisors, without any action being taken, with the exception of resulting in Plaintiff Yassine's termination from employment;

45. Throughout his employment with Defendant University Hospitals and Southwest, Plaintiff Yassine was subjected to different work assignments than his coworkers, including different terms and conditions of employment based on his religion, Islam, and his Arab heritage, by retaliating against him for filing verified complaints of discrimination and by terminating him. Plaintiff Yassine was treated and spoken to differently than his white counterparts, Plaintiff Yassine was subjected to disparaging remarks by managers in front of coworkers;

46. The foregoing acts and/or omissions of employment discrimination and unlawful employment practices are set forth by way of illustration of the general course of conduct of Defendants and not by way of limitation of such conduct on the part of Defendants;

**First Cause of Action**
**Title VII of the 1964 Civil Rights Act**
**Title I of the 1991 Civil Rights Act**

47. Plaintiff Yassine repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 46 as if more fully set forth at length herein;

48. Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq., prohibits discrimination in employment on the basis of race, color, religion or national origin. The

unlawful employment practices and employment discrimination complained of above were intentional within the meaning of Section 1977(a)(2) and (b) of the Civil Rights Act of 1991, 42 U.S.C. Section 1981a;

49. At all relevant times, Defendants acted with malice and reckless indifference to the statutorily protected rights of Plaintiff Yassine in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq., Title I of the Civil Rights Act of 1991, 42 U.S.C. Section 1981a and other statutes;

50. As for his causes of action against Defendants regarding their conduct herein alleged, intentionally, willfully and without justification, did deprive Plaintiff Yassine of his rights, privileges and immunities secured to him by the Constitution and the laws of the United States, particularly his right to be free from unlawful employment practices and employment discrimination as provided by Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq., and title I of the Civil Rights Act of 1991, 42 U.S.C. Section 1981a, Plaintiff Yassine has suffered damages which continue to accrue and for any and all back pay, front pay, compensatory and punitive damages by law, including interest and attorneys' fees, made and provided, in an amount exceeding $1,500,000.00;

### Second Cause of Action
### Violation of Ohio's Fair Employment Practices Law
### Ohio Rev. Code Section 4112 et seq.

51. Plaintiff Yassine repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 50 as if more fully set forth at length herein;

52. Defendants University Hospitals and Southwest fall under the purview of Ohio's Fair Employment Practices Law pursuant to Ohio Rev. Code Section 4112 et seq. since they employ

15

four or more individuals within the state. Moreover, individual Defendants herein also fall under Ohio's Fair Employment Practices Law since they are alleged to have committed individual acts of discrimination/harassment in the workplace;

53. Defendants terminated Plaintiff Yassine, and otherwise discriminated against him, without just cause, with respect to his compensation, terms, conditions or privileges of employment, because of his race, color, religion and national origin, and limited, segregated and/or classified his employment in a way which deprived him of employment opportunities, or otherwise adversely affect his status as an employee, because of his race, color, religion and national origin. As a direct result of Defendants' action, collective and/or otherwise. Individual Defendants fall under the purview of Ohio's Fair Employment Practices Law pursuant to Ohio Rev. Code Section 4112 et seq. Genaro v. Central Transport, Inc. (1997), 80 Ohio St. 3d 1414; Plotner v. Swanton Local Board of Education, 85 F. Supp. 2d 747 (N.D. Ohio 2000);

54. At all relevant times, Defendants acted with malice and reckless indifference to the statutorily protected rights of Plaintiff Yassine in violation of Ohio Rev. Code Section 4112 et seq.;

55. Ohio Rev. Code Chapter 4112 imposes individual liability on managers and supervisors for their discriminatory conduct found to be in violation of R.C. Chapter 4112. As for his causes of action against Defendants regarding their conduct herein alleged, Plaintiff Yassine alleges that Defendants did intentionally, willfully and without justification deprive Plaintiff Yassine of his rights, privileges and immunities secured to him by the Constitution of the United States, the Ohio Constitution and the laws of State of Ohio, particularly his right to be free from unlawful employment practices and employment discrimination as provided by Ohio Rev. Code Section 4112 et seq. Plaintiff Yassine has suffered damages which continue to accrue and for any and

all back pay, front pay, compensatory and punitive damages by law, including interest and attorneys' fees, made and provided, in an amount exceeding $1,500,000.00;

### Third Cause of Action
### Public Policy Tort

56. Plaintiff Yassine repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 55 as if more fully set forth at length herein;

57. Defendants discharged Plaintiff Yassine, and otherwise discriminated against him, without just cause, with respect to his compensation, terms, conditions or privileges of employment, because of his race, color, religion and national origin, and limited, segregated and/or classified his employment in a way which deprived him of employment opportunities, or otherwise adversely affect his status as an employee, because of his race, color, religion and national origin. As a direct result of Defendants' action, collective and/or otherwise, Defendants violated a clearly defined Ohio public policy, Greeley v. Miami Valley Maintenance Contractors, Inc. (1990), 49 Ohio St. 3d 228; Painter v. Graley (1994), 70 Ohio St. 3d 377;

58. As such, Plaintiff Yassine is entitled to this cause of action in addition to remedies available under Ohio Rev. Code Section 4112. Collins v. Rizkana (1995), 73 Ohio St. 3d 65; see also Kulch v. Structural Fiberts, Inc. (1997), 78 Ohio St. 3d 134;

59. Plaintiff Yassine has suffered damages which continue to accrue and for any and all back pay, front pay, compensatory and punitive damages by law, including interest and attorneys' fees, made and provided, in an amount exceeding $1,500,000.00;

### Fourth Cause of Action
### Ohio's Aiding And Abetting Statute
### Ohio Rev. Code Section 4112.02(J)

60. Plaintiff Yassine repeats, reiterates and re-alleges each and every allegation contained in

17

paragraphs 1 through 59 as if more fully set forth at length herein;

61. Defendants aided, abetted, incited, compelled, or coerced the actions alleged herein, or obstructed or prevented any person from complying with Ohio Rev. Code Section 4112 et seq.;

62. Plaintiff Yassine has suffered damages which continue to accrue and for any and all back pay, front pay, compensatory and punitive damages by law, including interest and attorneys' fees, made and provided, in an amount exceeding $1,500,000.00;

## Fifth Cause of Action
## Intentional and Negligent Infliction of Emotional Distress

63. Plaintiff Yassine repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 62 as if more fully set forth at length herein;

64. Defendants have a duty to provide Plaintiff Yassine with an environment at the place of employment that is free from unlawful employment practices and employment discrimination. Defendants' action and/or conduct hereunder breached that duty and was intentional and/or reckless in nature, as well as being extreme and outrageous, being of a nature that was rife with unlawful conduct, which resulted in the infliction of emotional distress upon Plaintiff Yassine;

65. There exists a causal connection between the severe emotional distress sustained by Plaintiff Yassine. Plaintiff Yassine has undergone psychiatric and other emotional treatment as a direct result of Defendants' actions/omissions;

66. Plaintiff Yassine has suffered damages which continue to accrue and for any and all back pay, front pay, compensatory and punitive damages by law, including interest and attorneys' fees, made and provided, in an amount exceeding $1,500,000.00;

## Sixth Cause of Action
### Retaliation

67. Plaintiff Yassine repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 66 as if more fully set forth at length herein;

68. Defendants University Hospitals and Southwest illegally retaliated against Plaintiff Yassine after Plaintiff Yassine by terminating his employment after he continuously complained to Defendants University Hospitals and Southwest regarding discrimination and harassment at work. Such action violates the antiretaliation provisions of Title VII of the Civil Rights Act;

69. Such actin by Defendants University Hospitals and Southwest were fraudulent, intentional and malicious, entitling Plaintiff Yassine to punitive damages;

70. Plaintiff Yassine has suffered damages which continue to accrue and for any and all back pay, front pay, compensatory and punitive damages by law, including interest and attorneys' fees, made and provided, in an amount exceeding $1,500,000.00;

## Seventh Cause of Action
### Wrongful Discharge

71. Plaintiff Yassine repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 70 as if more fully set forth at length herein;

72. Plaintiff Yassine was wrongfully discharged in violation of clear public policy against discrimination on the basis of race, national origin and religion;

73. Plaintiff Yassine has suffered damages which continue to accrue and for any and all back pay, front pay, compensatory and punitive damages by law, including interest and attorneys' fees, made and provided, in an amount exceeding $1,500,000.00;

### Eighth Cause of Action
### Defamation

74. Plaintiff Yassine repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 73 as if more fully set forth at length herein;

75. Defendants herein made malicious statements involving Plaintiff Yassine to the FBI with knowledge that such statements were false or with reckless disregard for whether they were true or false. Such statements were defamatory and have ruined Plaintiff Yassine's reputation in the community;

76. Plaintiff Yassine has suffered damages which continue to accrue, compensatory and punitive damages by law, including interest and attorneys' fees, made and provided, in an amount exceeding $1,500,000.00;

WHEREFORE, Plaintiff Yassine demands relief and judgment, as described herein, against Defendants, individually and/or severally, in the total amount in excess of $12,000,000.00, along with any and all other relief as this Court deems to be appropriate.

Respectfully Submitted,

J. M. Smaili, Esq. (0069768)
J. M. Smaili, Esq., L.L.C.
1360 West 9th Street, Suite 310
Cleveland, Ohio 44113
216.685.9500 (phone)
216.685.9685 (facsimile)
Attorney for Plaintiff Nasser Yassine